IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION

| | | |
|---|---|---|
| **OFFICER ALICE M. CARSON-JOHNSON,** | * | |
| 1447 Viridian Road | | |
| Aberdeen, MD  21001 | * | |
| | | |
| Plaintiff, | * | |
| | | |
| v. | * | Civil Action No.: 1:18-cv-_____ |
| | | |
| **GARY TUGGLE**, | * | |
| in his official capacity as Interim | | |
| Commissioner of the Baltimore Police | * | |
| Department | | |
| 601 E. Fayette Street | * | |
| Baltimore, Maryland 21202 | | |
| | * | |
| and | | |
| **BALTIMORE CITY POLICE DEPARTMENT** | * | |
| 601 E. Fayette Street | | |
| Baltimore, MD  21202 | * | |
| | | |
| **Serve On**: | * | |
| Brian E. Frosch, Maryland Attorney General | | |
| 200 St. Paul Place | * | |
| Baltimore, MD  21202 | | |
| | * | |
| Defendant. | | |
| | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## COMPLAINT AND REQUEST FOR JURY TRIAL

NOW COMES Plaintiff, Officer Alice M. Carson-Johnson ("Plaintiff" or "Johnson"), by

and through her counsel, Michael E. Glass, MBA, Esq. and The Michael Glass Law Firm, and,

brings suit seeking redress for unlawful employment practices, as described *infra*, perpetrated by

Defendants the Baltimore City Police Department (BCPD) and Gary Tuggle in his official capacity

as Interim Commissioner of the Baltimore City Police Department for gender and race-based

1

discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964 ("Title

VII"), as amended, 42 U.S.C. Sections 2000e *et seq.*, and Section 1981 of the Civil Rights Act of

1866 ("Section 1981"), as amended, 42 U.S.C. § 1981,  and in support states:

## INTRODUCTION

1)      This is a civil action seeking compensatory and punitive damages and injunctive

relief against the Baltimore City Police Department ("BPD" or "BCPD") to redress its

actions for gender and race-based discrimination and retaliation against the Plaintiff in

violation of Title VII of the Civil Rights Act of 1964 (as amended), 42 U.S.C. § 2000e *et*

*seq*. and deprivations of Plaintiff's rights.

## JURISDICTION AND VENUE

2)      The jurisdiction of this court is invoked pursuant to 28 U.S.C. Sections 1331, 1343,

and 42 U.S.C. Section 2000e-5(f).  Venue is established in this Court pursuant to 28 U.S.C.

Section 1391 and 42 U.S.C. Section 2000e-5(f). The jurisdiction of this court is also

invoked pursuant to 28 U.S.C. §1343(3) and 1343(4) conferring original jurisdiction upon

this court of any civil action to recover damages or to secure equitable relief under 42

U.S.C. §1981.

3)      Venue is proper in this judicial district pursuant to 42 U.S.C. § 2000e -5 (f) and 28

U.S.C. § § 1391(b), since the unlawful employment practice was committed in this district,

because the Defendants reside in this judicial district, and a substantial part of the events

giving rise to this case occurred in this judicial district.

4)      The amount in controversy, exclusive of interest and costs, exceeds the sum of

Seventy-Five Thousand ($75,000.00) Dollars.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

5)      Plaintiff filed a timely charge of discrimination with the Equal Employment Opportunity Commission on or around November 12, 2015 (**Exhibit 1**) and filed a subsequent Charge on or around March 3, 2016 for retaliation (**Exhibit 2**).

6)      The Plaintiff received a Right-to-Sue Letter on or around July 11, 2018 from the Equal Employment Commission more than 180 days after he filed his Charge of Discrimination. (**Exhibit 3**).

7)      The Plaintiff has bought suit within 90 days from the date in which she received the July 11, 2018, Right-to-Sue Letter.

## PARTIES

8)      The Plaintiff, Officer Alice M. Carson-Johnson, is a resident of the State of Maryland who resides in Harford County.

9)      The Defendant, the Baltimore City Police Department ("BPD" or "BCPD") is a government agency enforcing the criminal laws of the State of Maryland in the City of Baltimore. The BPD employs over 100 people.

10)      The Defendant, Gary Tuggle is the Interim Baltimore Police Commissioner for the Baltimore City Police Department and is gainfully employed in of the State of Maryland and the City of Baltimore.

## FACTS COMMON TO ALL COUNTS

11)      Johnson is a 21-year police officer veteran of the Baltimore City Police Department.

12)     Johnson entered service with the BPD on August 4, 1997, and has been consistently employed for over 21 years.  She was a highly regarded officer prior to the filing of the discrimination complaints outlined below.

13)     She also served our country for twenty-two and a half years retiring as a Sergeant First Class in the Army.  She served in Desert Storm from 1990 to 1991, and served in Operation Iraqi Freedom and Operation Endure Freedom from March 2008 to March 2009.

14)     She has extensive training in emergency medical care and served as a Tactical Combat Medic in the Army.  She has trained extensively in the military in the state of Maryland teaching combat medic lifesaving techniques.

15)     While employed by the BPD, she developed a trauma management course (which Officer Donald Slimmer ended up changing the name to TacMed, took Plaintiff's materials, and claimed the course for his own, further taking credit for developing it (even though Plaintiff developed the materials and the program).

16)     Plaintiff is probably the best-trained police officer in emergency medical services in the entire BPD.  As is explained more fully *infra*, the BPD has retaliated against her by depriving her of the opportunity to continue to train police officers in emergency medical care.

17)     While at the BPD, Plaintiff was a Law Enforcement Emergency Medical Care Course (LEEMCC) Instructor, a job that she excelled at (particularly given her extensive combat medical emergency treatment experience and training) and loved.

18)     On November 12, 2014, Johnson filed an internal discrimination complaint with the

BCPD's EEOC section alleging that Sgt. Brian Dayton was discriminating against her as

an African American female in comparison to white female officers including Officer

Donna Rill.  Plaintiff cited to disparaging and belittling treatment that she received from

Dayton.

19)     In January 2015, Plaintiff suffered on-line duty injuries and was mandated to do a

fitness-for-duty test by Lt. Sherri Sterm. Officer Donna Rill, a white officer, had on-line

duty injuries but was not mandated to do a fitness-for-duty test.

20)     On September 3, 2015, Plaintiff requested to conduct training events, and requested

equipment for those training events.  She was denied the opportunity to do trainings, and

was then transferred to daily detail assignments by Lt. Sherri Sterm.  In contrast, Officers

Andrew Davis (male) and Darron Belechto (male) requested to conduct training and

equipment, which was granted, and were not transferred to detail assignments.

21)     Plaintiff is more qualified, better trained, and has more experience than any of her

comparators.  No reasonable explanation (much less any explanation whatsoever) was

given for this disparate treatment and, specifically, for denying Plaintiff conducting

training and being provided training supplies.

22)     After Plaintiff filed her initial internal discrimination complaint on November 12,

2014, and then after she filed her EEOC complaint on November 12, 2015,  Defendant

BCPD stepped up its retaliatory campaign against Plaintiff.

23)     By way of example (but not limitation), on August 27, 2015, Plaintiff wrote to Lt.

Jason Callaghan regarding being charged with insubordination after Plaintiff was given

conflicting orders from two sergeants: one (Sgt. Marlon Mosley) told her not to hand over keys to a classroom  --containing training materials and equipment for which Plaintiff was responsible—to anyone without permission, and another sergeant (Sgt. Brian Dayton) then demanded she give him the keys.

24)     When Sgt. Dayton asked for the keys, Plaintiff told him she had been ordered by Sgt. Mosley not to turn them over without permission, and respectfully asked Dayton to speak with Mosley so that she would not be violating Mosley's direct order by giving Dayton the keys without express permission from Mosley.  Rather than speaking with the Mosley, Dayton charged Plaintiff with insubordination and wrote her up.

25)     On August 28, 2015 --because of a miscommunication— Plaintiff inadvertently missed a meeting with Assistant State's Attorney Janet Bledsoe to discuss facts pertaining to the Freddie Gray case.[1]  The meeting was initially to be with ASA John Butler who, at the last minute, indicated that he was closing on a house and would not be attending.

26)     For missing a meeting –that was simply and easily rescheduled—Plaintiff was not only disciplined, but also was subjected to having to defend herself at a trial board.

27)     A three-person police panel headed by Major James Handley found Johnson guilty of misconduct for missing the meeting, which was not even her fault.

28)     The disciplinary action was highly embarrassing since Plaintiff was the first officer to undergo a public misconduct trial board hearing. Indeed, the guilty finding was written up in the Baltimore Sun on October 4th, 2016.

---

[1] Plaintiff had been identified as a potential witness to testify about police training related to emergency first aid treatment and training the charged officers had received.

6

29)     That Plaintiff had to defend herself at a trial board, that it was written up in the Sun,

much less that she was charged in the first place is so completely and patently absurd,

particularly when considering such a trivial occurrence.

30)     Although ASA Bledsoe was blamed for lodging the complaint, it was really Lt.

Sherri Sterm who initiated the discipline which was clearly retaliation for lodging the

discrimination complaints.

31)     Indeed, although the Baltimore Sun stated that ASA Bledsoe had lodged the

complaint against Plaintiff that led to her discipline and the write-up in the newspaper,

Bledsoe not only denied it, but wrote in a text message:

> "…Maybe you need to look within on this issue and find out … why this [was] the
> 1st public trial board hearing for an officer who cooperated … It is sad that your
> organization [the BCPD] was unable to support this officer.  **She is one of the good
> officers.  She follows her orders, reads her emails, responds to people in need
> and cares about the citizens of Baltimore City.**  And no I wasn't the complainant
> against this officer.  In fact I didn't want any action taken against her."

32)     It is astounding that Plaintiff was subject to discipline for inadvertently missing a

meeting, particularly when the attorney with whom the meeting was to take place took no

issue.  And, of course, there are numerous instances of comparators that missed meetings,

appointments and court dates that were not disciplined much less having to face a trial

board over such a trivial occurrence.

33)     Indeed, it is patently clear that the motivation for this disparate treatment was

retaliation. Defendant continued its campaign of retaliation of bogus write-ups,

reprimands, and disciplinary action.

34)      On September 4, 2015, Plaintiff was removed from her training position and detailed to the Headquarters Building Security, a position known for assignment of those officers the BCPD deems to be "screw-ups."  It is commonly known that assignment to security is a way of shaming an officer.

35)      Therefore, instead of the BPD utilizing Officer Johnson's extensive emergency medical experience and know-how to train other officers, she became a glorified doorman, pushing a bottom to buzz people in at the front door of the Headquarters Building.

36)      Indeed, such flagrant underutilization of such a gifted officer with over 20 years of service to the BPD and another 22 years of service in the military exemplifies to extent to which the BPD went and continues in its efforts to retaliate against Plaintiff and any others who speak out about wrongdoing or illegal conduct.

37)      After Plaintiff was detailed to Headquarters Building Security, she made multiple attempts to recover her personal property (including equipment that she had provided) from the training facility.  Defendant BCPD, however, did everything it could to make her jump through needless hoops to make it as difficult as possible to recoup her belongings.

38)      One such item was a Moulage Kit with an estimated value of $2,300.00.  Plaintiff had gotten the kit from Connor Scott of the Baltimore City Mayor's Office of Emergency Management.  The kit did not belong to Plaintiff and she wanted to retrieve it to return it to Mr. Scott.

39)      The BPD, however, refused to give it back to her.  Plaintiff felt badly and even offered to pay Mr. Scott to replace the one that BPD refused to return.  It was only after several months passed that Plaintiff was able to retrieve the kit.

40)     On October 12, 2015, Plaintiff submitted a memo to Major Mark Partee, Director
of Professional Development and Training Academy, detailing her personal property she
sought to recover.  As an Emergency Medical Technician, CPR Instructor, and Tactical
Combat Casualty Care Trainer with responsibilities outside the BCPD, Plaintiff sought to
recover several training and other items that she had purchased with her own money.

41)     To make it all the more difficult, Defendant forced her to produce receipts for any
items she claimed were hers, and refused to let her take property that belonged to her for
which she could not produce a receipt.

42)     On February 24, 2016, Plaintiff was notified that she was the subject of an internal
investigation for allegedly providing false information to Sgt. Habib Kim on October 20,
2015, an allegation made for purposes of retaliation that was completely bogus.

43)     On February 25, 2016, Plaintiff was notified that she was the subject of an internal
investigation for allegedly providing information to Lt. Sherri Sterm in August 2015, a
completely bogus allegation clearly made for purposes of retaliation.

44)     Plaintiff has been a Baltimore City police officer for over 21 years, and because she
filed discrimination claims both internally and with the EEOC, Defendant BCPD has
intentionally, willfully and maliciously destroyed her reputation and demoted her to tasks
and duties well below her capabilities.

45)     Sadly, Defendant BCPD has fostered a work culture where if police officers speak
out against violations of policy, corrupt or illegal activity, they are punished and retaliated
against.

46)     In contrast, in the instance of police officers who actively engaged in illegal activity

terrorizing the citizens of Baltimore City, Defendant BCPD merely looked the other way

and did nothing to stop it.

47)     The situation became so dire that the Federal Department of Justice was forced to

come in to evaluate the corruption and toxic culture in the BCPD.   Regarding police

officers speaking out against wrongdoing in the Department, the DOJ found:

> The cultural opposition to meaningful accountability within the Department
> is reflected by the lack of discipline for serious misconduct and widespread
> violations of minor policy provisions; the failure to take action against
> officers with a known reputation for repeatedly violating Department policy
> and constitutional requirements; and the reluctance of officers to report
> observed misconduct for fear that doing so will subject them to retaliation.

DOJ Report, p. 149.   Such is the fate endured and suffered by Plaintiff and

facilitated by Defendant BCPD.

48)     The DOJ Report continued:

> BPD's systemic accountability failures have also contributed to a culture
> in which some officers are reluctant to raise concerns to supervisors about
> problematic policing practices or identify misconduct by their fellow
> officers. Several officers told Justice Department investigators that they
> believe their fellow officers have retaliated against them for reporting
> misconduct or objecting to improper enforcement activities. Other officers
> expressed fears that they would face such retaliation, and that BPD
> supervisors would not address any retaliation that occurs. Our review of
> BPD's internal affairs files underscores these concerns.

*Id.*

49)     In April 2017, the BCPD entered into a more than 200 page consent decree with the

DOJ.   Among numerous other things, the BCPD agreed:

> All forms of retaliation, interference, intimidation, coercion, or adverse action
> against any person, civilian or sworn officer, who, because that person reports

misconduct, attempts to make or makes a misconduct complaint, or cooperates with an investigation of misconduct, are strictly prohibited and shall result in discipline, demotion, and/or appropriate corrective action based on the seriousness of the conduct;

Consent Decree ¶337 (c).

50)     Yet, despite the DOJ's findings and the BCPD's agreement to make corrections, in

addition to Defendants violating federal employment laws, Plaintiff is still being retaliated

against.

51)     Indeed, rather than training, she is still exiled in Building Security detail, is still

subject to passive aggressive conduct from her supervisors, and bogus disciplinary

actions, and is not able to perform job functions (such as training) that she is eminently

qualified to do.

52)     On May 8, 2015 Plaintiff became a Maryland-certified Emergency Medical

Technician.  On May 13, 2015, Plaintiff renewed her EMS Certification.

53)     On September 3, 2015, however, she was removed from the Professional

Development and Training Academy.

54)     On September 30, 2015, Sgt. Donald Slimmer sent an email to all BPD that the

department was looking for CPR instructors.  The search continued at least through April

2016, despite that this was training that Plaintiff had provided and that she was ready,

willing, able, and eager to provide.  Indeed, despite that she was eminently qualified (and

perhaps the most qualified officer in the entire BCPD) to provide the training, she was not

considered.  Indeed, rather than fill the position with Plaintiff, BPD chose to have the

position remain vacant.

55)     Prior to making the formal EEOC complaint, Johnson was a highly decorated and regularly recognized police officer, receiving numerous accolades for her workplace achievements. After making the formal internal discrimination complaint and the subsequent EEOC complaints, Johnson continuously and repeatedly has suffered retaliation and harassment. She has been repeatedly denied training and other advancement opportunities, has been removed from training responsibilities for which she is eminently qualified (and perhaps the most qualified police officer for such work) and has been relegated to security detail in retaliation for her complaints.

56)     Prior to initiating the discrimination and retaliation complaints, Plaintiff had a spotless record with internal affairs related issues (prior to November 2014).

57)     Police Officer Tasha Taru submitted several memoranda and letters in support of Plaintiff attesting that she did not understand why Plaintiff has been singled out, has been subjected to such unfair treatment, and that it appears that the police department is out to get Plaintiff.

58)     The retaliation has continued through and including up until the present as Plaintiff's training responsibilities have not been restored and she continues to be banished to menial security detail.

59)     Plaintiff, by all accounts, is a hard-working, productive, and honest member of the Baltimore Police Department.

60)     Should this matter go to trial, Plaintiff will call an expert fact witness who will testify that Defendant actively encourages retaliation by ignoring its own policies,

attacking officers who file complaints of any sort, and has been and continues to be in violation of the Department of Justice (DOJ) Consent Decree.

61)     When this matter goes to trial, Plaintiff will call medical experts who will testify that Plaintiff has suffered anxiety, stress, depression, and mental pain and suffering as a direct and proximate result of the incessant retaliation and harassment levied against her.

62)     Prior to lodging discrimination complaints, Plaintiff had never been charged with any internal disciplinary violation while in the BCPD.

63)     The false write-ups, meritless and bogus disciplinary actions and charges brought against Plaintiff, and the deprivation of meaningful work assignments, have been perpetrated with malice, scienter, and ill-will with the intent of causing mental pain, suffering, loss of reputation, anxiety, and humiliation to Plaintiff, all of which the BCPD has accomplished.

## COUNT I
## DISPARATE TREATMENT IN VIOLATION OF TITLE VII

64)     Plaintiff re-alleges and incorporates by reference the previous averments, and the paragraphs, *infra*, into this count as though fully set forth herein, and further alleges that at all times relevant hereto Plaintiff suffered disparate treatment because of her race and/or sex in violation of Title VII.

65)     The Defendants and their employees and representatives intentionally, with malice and reckless indifference to federal, state, and local laws prohibiting racial and/or sex discrimination in employment, directly discriminated against Officer Johnson and treated her  less favorably than Donna Rill, Andrew Davis, Darren Belechto, and other white

and/or male employees in comparable positions and/or subject to the same company rules regarding providing training and receiving discipline for comparable alleged infractions.

66)     Plaintiff reasonably believes the action of Defendants to repeatedly discipline Plaintiff for imaginary and/or petty infractions, and failing to take action against other white and/or male officers was motivated by racial and/or gender-based disfavor and animus against Plaintiff as an African American and/or female.

67)     Plaintiff reasonably believes the actions of Defendants to repeatedly deprive her of providing training but providing such opportunities to white and/or male officers who are less qualified and experienced was motivated by racial and/or gender-based disfavor and animus against Plaintiff as an African American and/or female.

68)     The racial and/or gender-based discriminatory action detrimentally affected Plaintiff and would detrimentally affect a reasonable person of the same race and/or gender in that position.

69)     The racial and/or gender-based discriminatory action suffered by Plaintiff affected the terms, conditions, and privileges of her employment.

70)     Defendants had actual and/or constructive knowledge about the racial and/or gender-based discrimination and disparate treatment and not only failed to take prompt and adequate remedial action, but instead, participated in the racial and/or gender-based discriminatory conduct and disparate treatment of Plaintiff.

71)     As a direct and proximate result of this racial and/or gender-based discrimination and disparate treatment, Plaintiff has suffered injury to her reputation and career, pain, mental anguish, and humiliation; and, faces irreparable harm and future losses.

14

<u>**COUNT II**</u>
<u>**DISPARATE TREATMENT IN VIOLATION OF SECTION 1981**</u>

72)     Plaintiff re-alleges and incorporates by reference the paragraphs, *supra*, and the

paragraphs, *infra*, into this count as though fully set forth herein, and further alleges that

at all times relevant hereto Plaintiff suffered disparate treatment because of her race  as an

African American, in violation of Section 1981.

73)     The Defendants intentionally, with malice and reckless indifference to federal, state,

and local laws prohibiting racial discrimination in employment, directly discriminated

against Plaintiff and treated Plaintiff less favorably than Donna Rill, Andrew Davis,

Darron Belechto and other white and/or male employees subject to the same disciplinary

rules, and the same training opportunities as Plaintiff.

74)     Plaintiff reasonably believes the actions of Defendants to engage in repeated bogus

write-ups and disciplinary measures, but failing to take action against other white

employees similarly situated who committed like or worse infractions without discipline

(or as extensive discipline), were all motivated by racial disfavor and animus against

Plaintiff because of her race as an African American or gender.

75)     The racial discriminatory action detrimentally affected Plaintiff, and would

detrimentally affect a reasonable person of the same race and/or gender in that position.

76)     The racial and gender-based discriminatory action suffered by Plaintiff affected the

terms, conditions, and privileges of Plaintiff's employment wit the BCPD.

77)     Defendants had actual and/or constructive knowledge about the racial and gender-

based discrimination and disparate treatment and not only failed to take prompt and

adequate remedial action, but instead, participated in and encouraged the racial discriminatory conduct and disparate treatment of Plaintiff.

78)     As a direct and proximate result of this racial discrimination and disparate treatment, Plaintiff has suffered injury to her reputation, pain, mental anguish, and humiliation; and, faces irreparable harm and future losses.

## COUNT III
## RETALIATION IN VIOLATION OF TITLE VII AND SECTION 1981

79)     Plaintiff individually realleges and incorporates the preceding paragraphs and the paragraphs, *infra*, into this count as though fully set forth herein, and further alleges that at all times relevant hereto Plaintiff was retaliated against in violation of Title VII and Section 1981.

80)     Defendant directly and/or by and through its employees intentionally, with malice and reckless indifference to its obligations under federal, state and local laws, retaliated against Plaintiff for filing internal discrimination and EEOC complaints against Defendant.

81)     The retaliatory conduct Plaintiff was subjected to constitutes an adverse employment action because the terms and conditions of Plaintiff's employment were adversely affected or altered by stripping her of her training responsibilities and disciplining Plaintiff for bogus and meritless infractions.   The meritless disciplinary actions against Plaintiff and stripping her of meaningful tasks such as medical training and, instead, forcing her as a 20-year veteran of the force to be a glorified doorman is

causally linked to Plaintiff engaging in protected activity, specifically, lodging discrimination complaints internally and with the EEOC.

82)     The retaliatory actions taken against Plaintiff constituted adverse employment actions and altered the terms, conditions and privileges of her employment with the Defendant BPD.

83)     Plaintiff complained to Defendants about the harassment and discrimination she experienced and otherwise opposed practices made unlawful by Title VII.

84)     Defendants are fully aware of the retaliation against the Plaintiff detailed herein, and in fact, the Defendants have participated in the racially motivated and gender-based retaliatory action.

85)     Defendants could and should have taken steps that would have prevented the deprivation of Plaintiff's rights caused by this retaliation.

86)     As a direct and proximate result of these retaliatory actions, Plaintiff has suffered irreparable injuries, including but not limited to loss of pay, benefits and other economic losses, job satisfaction, chance for advancement, emotional pain and suffering, mental anguish, humiliation, embarrassment, personal indignity, loss of reputation, and other intangible injuries for all of which she should be compensated.

87)     The words and actions of Defendants demonstrate that Defendants maliciously intended to cause harm to Plaintiff, including attempting to set her up and cause her to be fired with bogus write-ups and other disciplinary actions.  The malicious intent is evidenced not only by the conduct of Plaintiff's supervisors in their retaliatory acts, but by their words.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Johnson prays that this court enter judgment in her favor and grant her the maximum relief allowed by law, including, but not limited to:

(a) back wages;

(b) reinstatement of her training job duties and/or front pay;

(c) punitive damages;

(d) compensatory economic and non-economic damages in excess of Seventy-Five Thousand Dollars including compensation for mental pain, suffering, humiliation, and loss of reputation;

(e)  injunctive relief including purging her employment file of bogus write-ups and charges;

(d)       reasonable attorneys' fees, costs, pre- and post-judgment interest; and

(e)  such other relief as are just and equitable under the circumstances.


Respectfully submitted,

_____/s/_____
Michael E. Glass, MBA, Esq., Trial Bar No. 11805
The Michael Glass Law Firm
201 N. Charles Street, Suite 1900
Baltimore, Maryland 21201
Phone: (410) 779-0600, Fax: (410) 814-4604
Email: mglass@mglasslaw.com

*Attorneys for Officer Alice Carson-Johnson*

## **PRAYER FOR JURY TRIAL**

Plaintiff Johnson prays to have this case tried by a jury.


_____/s/_____
Michael E. Glass, MBA, Esq.,